1.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>RAUL RAMIREZ BARRAGAN,<br>Defendant. | Case No. 19-cr-00030-SI-1<br><br>**ORDER DENYING MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 46 |

Defendant Raul Ramirez Barragan has filed a motion to suppress evidence. Dkt. No. 46. Following a hearing on the motion to suppress on August 16, 2019, the Court set an evidentiary hearing, which was held on October 16, 2019. After careful consideration of the parties' arguments and the evidence presented, the Court hereby DENIES defendant's motion to suppress.

## BACKGROUND

### I. Procedural Background

On January 17, 2019, the government filed an indictment charging Barragan with one count of violating 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition. Dkt. No. 1. The indictment alleges, "[o]n or about December 6, 2018, in the Northern District of California, the defendant, Raul Ramirez Barragan, having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess a firearm and ammunition, namely, one Kel-Tec 9mm semiautomatic pistol . . ., and 27 rounds of 9mm ammunition. . . ." *Id.* at 3.

The indictment flows from the search and seizure of Barragan, and of the subsequent searches of his residence and cell phone, as discussed in greater detail below. On July 19, 2019,

Barragan filed a motion to suppress "all fruits of the unlawful seizure and warrantless search of his person on December 6, 2018, the search of the Wilkens Avenue residence, and the subsequent search of his cell phone." Dkt. No. 46 ("Mot.") at 1. In support of his motion, Barragan filed a copy of several officer reports and a computer-aided dispatch printout from the date of his arrest as well as a video identified as body cam footage of Napa County Sheriff's Deputy Gary Donaldson. Dkt. No. 47-3. Barragan requested an evidentiary hearing "[s]hould any disputed issue of material fact arise with respect to this motion[.]" Mot. at 1.

In support of its opposition to the motion, the government filed: a copy of Barragan's prior conviction and probation conditions in Napa County Superior Court; a copy of a Napa County Superior Court bench warrant dated October 1, 2018, issued following Barragan's failure to attend appointments with his Probation Officer on August 28 and September 10, 2018;[1] a declaration from Napa County Sheriff's Deputy William Branco, a Detective in the Napa Special Investigations Bureau ("NSIB"); and a declaration from Napa County Sheriff's Deputy Ken Van Dyke, also a Detective in the NSIB. Dkt. Nos. 49 ("Opp'n"), 50, 51, 52.

Barragan filed a reply, attaching several additional exhibits. Dkt. Nos. 53 ("Reply"), 54.

At the evidentiary hearing, the Court heard testimony from two government witnesses: Shontelle Detwiler, Records Supervisor with the Napa County Sheriff's Office; and Detective Branco.[2]

## II. Factual Background

On December 6, 2018, at approximately 1:00 p.m., Detective Branco saw defendant Barragan, whom Detective Branco says he "knew from prior arrests and investigations, walking in the area of Shetler Ave and Soscol Ave." Bischof Decl., Ex. A ("Branco Report") at 7. Detective

---

[1] In the Comments section of the petition to revoke probation, the date of the first missed appointment is listed as August 28, 2018. The text in the body of the petition lists this date (presumably erroneously) as August 28, 2017. *See* Peng Decl., Ex. B.

[2] The government was also prepared to call Detective Van Dyke, whose testimony the government said would corroborate that of Detective Branco. After discussion on the record with defense counsel and with the Court, the government elected not to call Detective Van Dyke but reserved the right to do so in the future.

2

Branco's report states, "I knew BARRAGAN to have an active Felony Warrant, and to be on Formal Napa County Probation for possession of controlled substance for sales. I also knew BARRAGAN to be a Sureno gang member . . . ." *Id.* "BARRAGAN had a listed address on Wilken Ave, to multiple different apartments."

Detective Branco's report continues, in relevant part, as follows:

> I observed BARRAGAN travel northbound on Soscol Ave and sit down in a chair in front of Starbucks, located in the South Napa Marketplace. I parked my car in the parking lot and entered the Starbucks door directly next to BARRAGAN. As I walked passed [sic] him, I positively identified him as BARRAGAN. Moments later BARRAGAN left the area on foot and began walking east in the direction of Target. I followed BARRAGAN in my vehicle and observed him approaching the Target entrance. I then left the area and met with Detective[] Van Dyke to began [sic] surveillance of BARRAGAN to determine what house he entered.
>
> After returning to the area, I saw BARRAGAN walking west on Shetler Ave, in the area of Harding Ave. I lost sight of BARRAGAN and suspected he entered the residence at [REDACTED- Harding Ave], a residence known for Sureno gang activity. I had previously assisted on a search warrant at that address, in which BARRAGAN was the target. I stopped my car on Harding Ave, north of the residence, and began conducting surveillance.
>
> NSIB Detective Sgt McWilliams, Detectives Ensley and Smith arrived on scene a short time later, as well as Napa Sheriff's Office Deputy Donaldson, who was in full uniform and in a marked black and white NSO patrol vehicle. NSIB Detectives all wore raid vests with large chest patches displaying law enforcement agencies. An operational briefing was conducted via radio.
>
> A short time later, BARRAGAN exited the residence at [REDACTED- Harding Ave], wearing the same clothing I saw him in earlier. BARRAGAN was accompanied by another Hispanic Male Adult. I accelerated my car and stopped in front of the residence. I instructed BARRAGAN to get on the ground as I sprinted toward him. Det. Van Dyke instructed the other male to get on the ground. Barragan began to turn away from me to his left, and took a few steps toward the locked gate of the residence. The other subject also turned his body away and did not comply with the directive. As I reached BARRAGAN, he had his back completely toward me. I pushed him in his upper back with my hand, forcing him to the ground. I then secured BARRAGAN'S hands behind his back and detained him in handcuffs. The other male, who I identified from prior contacts as Jose MACIEL, was also secured in handcuffs.
>
> Prior to searching BARRAGAN, I asked him if he had anything on him. BARRAGAN said he had a gun on him. I asked him where. BARRAGAN used his head to point in the area of his left shoulder.[3] I rolled BARRAGAN on his left side,

---

[3] Barragan argues that this portion of Detective Branco's account contradicts the body-worn camera footage of Deputy Donaldson. *See* Bischof Decl., Ex. C. In it, Barragan and Maciel can be seen on the ground when an officer asks, "You have a gun on you, dude?" Barragan replies, "no." An officer then immediately says, "Gun!" It appears that the officers then remove something from Barragan's person while Barragan says, "That's it, bro. That's all I got. That's it." *Id.* at 00:15-

3

exposing a black pistol contained in the inside left breast pocket of his brown jacket. Deputy Donaldson removed the pistol from his left pocket. The pistol was loaded with a loaded magazine and a round in the chamber. Det. Smith cleared the gun and made it safe. Refer to Det Smith's supplemental report for details.

A black zippered pouch which was slung under BARRAGAN's left armpit was recovered. Inside the pouch were gun cleaning utensils, a folding knife and a single 9mm round.

A search of the residence was conducted, with no illegal substances being located. I took photos of the scene and the collective evidence.

Dispatch confirmed BARRAGAN was on formal Napa County Probation with terms including search and seizure (including electronics), and do not possess any firearms or deadly weapons. Dispatch also confirmed BARRAGAN had an Active Felony No Bail warrant for violation of probation. . . .

Prior to being transported to NCDC, BARRAGAN said he had more ammunition at his residence at [REDACTED- Wilkens Ave], Apt #7. BARRAGAN told me the ammunition was located in a black tool box. I traveled to the location and conducted a search in the room BARRAGAN, and the residents there, identified as his. On a dresser in the bedroom, in a black chest, I located (19) rounds of 9mm ammo.

*Id.* at 8-9.

On December 18, 2018, Detective Van Dyke began extracting data from Barragan's and Maciel's cell phones "for a case [he] was assisting NSIB Detective Branco investigate, and pursuant to their respective Napa County Probation with electronic search (CR 84169) and Parole terms." Bischof Decl., Ex. B ("Van Dyke Report") at 16. On December 19 and 20, 2018, Detective Branco "searched BARRAGAN's cell phone pursuant to his probation terms . . . ." Branco Report at 11. Detective Branco states, "I found numerous photos of BARRAGAN throwing up what appear to be gang hand signs. I also located photos of BARRAGAN posing, throwing gang signs and holding three different pistols, with one of the pistols appearing to be the pistol he was in possession of at the time of his arrest." *Id.*

---

00:29. The timestamp on the camera says this occurred at 2:39 p.m.
    At the evidentiary hearing, Detective Branco testified that Deputy Donaldson's body-worn camera footage began recording *after* the exchange in which Detective Branco asked Barragan if he had anything on him and Barragan confirmed that he did. Detective Branco also testified that he was not the officer who can be heard on the video asking "You have a gun on you, dude?" and that the individual who responded "no" was not Barragan but was Maciel.
    The Court finds these factual disputes are not germane to the motion to suppress and they do not alter the Court's credibility findings below.

4

**LEGAL STANDARD**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. When a search is conducted without a warrant, the analysis begins "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). For example, the Ninth Circuit has in some circumstances upheld warrantless searches conducted pursuant to a probation condition, *see, e.g., United States v. King*, 736 F.3d 805 (9th Cir. 2013), but has explained that "any search made pursuant to the condition included in the terms of probation must necessarily meet the Fourth Amendment's standard of reasonableness." *See United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016) (quoting *United States v. Conseuelo-Gonzalez*, 521 F.2d 259, 262 (9th Cir. 1975) (en banc)). Moreover, "[p]olice officers must know about a probationer's Fourth Amendment search waiver before they conduct a search in order for the waiver to serve as a justification for the search." *United States v. Job*, 871 F.3d 852, 859 (9th Cir. 2017).

Searches incident to lawful custodial arrests are also excepted from the Fourth Amendment's warrant requirement. *United States v. Robinson*, 414 U.S. 218, 235 (1973). The government bears the burden of establishing that a warrantless search was reasonable and did not violate the Fourth Amendment. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir. 1992), *cert. denied,* 510 U.S. 900 (1993) (citations omitted).

**DISCUSSION**

**I. The Officers Knew of Defendant's Outstanding Arrest Warrant Prior to the Arrest.**

The crux of the parties' dispute is whether the law enforcement officers who conducted the search knew of Barragan's outstanding arrest warrant and probation search conditions *prior* to searching his person on December 6, 2018. Barragan argues in his motion that the government provided only "unsupported assertions that Branco knew Mr. Barragan was on probation or had an

arrest warrant before the search" and that the lack of evidence on this point is insufficient to meet the government's burden. Mot. at 5. Barragan attaches the police report that Detective Branco authored, in which he states, "I knew BARRAGAN to have an active Felony Warrant, and to be on Formal Napa County Probation[,]" but in which Detective Branco does not say how he knew this information. *Id.* at 2; Branco Report at 7. Barragan contends that the evidence seized from his person, from the Wilkens Avenue residence, and from the search of his cell phone must be suppressed accordingly as the "fruits" of an unlawful warrantless search of defendant.

Based on the evidence the government put forth in its opposition brief and at the evidentiary hearing, the Court finds that Detective Branco did know of Barragan's outstanding arrest warrant when Detective Branco made the arrest on December 6, 2018. In support of its opposition, the government attaches a declaration from Detective Branco. Dkt. No. 51 ("Branco Decl."). In it, Detective Branco declares that he "first became aware of the defendant, Raul Barragan, when I arrested him in April 2017, during a routine traffic stop . . . ." *Id.* ¶ 3. Detective Branco also "was involved in investigating Mr. Barragan around August 2017, when I assisted Deputy Jason Pisaro in executing a search warrant of the residence located on Harding Avenue in Napa . . . after Mr. Barragan was found with methamphetamine in a vehicle. At the time of the search warrant, the Harding Residence contained paraphilia [sic] associated with the Surenos gang, leading me to believe that Mr. Barragan was affiliated with the gang. I also looked Mr. Barragan up in the Napa County Criminal Justice Net ('CJNet'),[] and learned that Mr. Barragan had been designated as a Surenos for jail housing classification." *Id.* ¶ 4. CJNet, Detective Branco explains, "is a local law enforcement database used by the [Napa Sheriff's Department], Napa Police Department, as well as Napa County Department of Corrections. The network permits search by individual name, and displays information associated with that individual, including addresses, . . . warrants, [and] probation status . . . . The database allows direct pulls of underlying documents, such as an arrest warrant or probation conditions." *Id.* ¶ 4 n.2.

Detective Branco goes on to declare that "[a]round September 2018, I arrested another individual for narcotics related charges ('Individual 1')." *Id.* ¶ 5. In October 2018, Detective Branco became a detective in NSIB. *Id.* ¶ 6. He states that "[a] detective who was departing the bureau

told me that Mr. Barragan was suspected of being involved in methamphetamine sales and that Mr. Barragan had Individual 1 as a runner." *Id.* "After learning this information, at some point between October 2018 and December 6, 2018, I looked up Mr. Barragan in again [sic] CJNet and saw that he had an outstanding arrest warrant, and that he was on probation with search conditions. Because of my prior interactions involving Mr. Barragan, additional information from the detective, and information learned through CJNet, Mr. Barragan remained on my radar though I did not actively look for him at that point in time." *Id.*

Detective Branco states that when he first saw Barragan on December 6, 2018, he did not immediately arrest him "because of concerns of officer safety." *Id.* ¶ 7. Instead, "I left the area, picked up Detective Van Dyke (also in plain clothes) in my car, and both of us proceeded to continue surveillance on Mr. Barragan." *Id.* While the detectives "were conducting surveillance outside the Harding Residence, Detective Van Dyke and I came up with an operation plan, which he wrote down, and arranged for additional officer back-up. The operation plan included information that Mr. Barragan had a felony warrant and a probation search and seizure condition." *Id.* Detective Branco attaches as Exhibit A to his declaration "sample screenshots of information retrieved from CJNet pertaining to Mr. Barragan." *Id.* ¶ 9, Ex. A. At the evidentiary hearing, the Court admitted into evidence Exhibit 5, which Detective Branco and Ms. Detwiler both testified were sample screenshots from Barragan's record in CJNet. Detective Branco testified that the "Warrants" tab at page RRB-00222, despite having a printed date-stamp of October 3, 2019, was the same warrant page for Barragan's arrest that Detective Branco viewed in CJNet in the fall of 2018, prior to arresting Barragan, with the exception that the entry stating that defendant was arrested on December 6, 2018, was not on the page because that arrest had not yet occurred.

Detective Van Dyke also filed a declaration in which he declares that on December 6, 2018, while he was waiting for Detective Branco to pick him up, Detective Branco "told me he saw Raul Barragan, who he knew to have an outstanding warrant and was a [sic] probation with a search condition[.]" Dkt. No. 52 ("Van Dyke Decl.") ¶ 2. Detective Van Dyke states, "I had previously been aware of Mr. Barragan because Detective Branco, who is in my same unit, had mentioned Mr. Barragan before as an individual he was looking for with an outstanding warrant . . . ." *Id.* ¶ 3.

7

Detective Van Dyke declares that while conducting surveillance outside of the Harding Avenue residence, he and Detective Branco "came up with an operation plan that I wrote down, including information relayed to me about Mr. Barragan by Detective Branco regarding the existence of the warrant and probation search terms . . . ." *Id.* ¶ 4. He attaches as Exhibit A redacted operations plan dated December 6, 2018. The parties stipulated to this same operations plan coming into evidence as Exhibit 4 in the evidentiary hearing. Detective Branco testified that this was the operations plan that he and Detective Van Dyke created prior to arresting defendant on December 6, 2018. At the top of the plan, two boxes are checked indicating that the "type of operation" is "ARREST" and "PROB/PAR/PRCS SEARCH."

Barragan argues that "[t]he government has not met its burden to show by a preponderance of the evidence that the officers knew of an outstanding arrest warrant and probation search condition before they arrested Barragan." Reply at 2. The Court disagrees. The declarations of Detectives Branco and Van Dyke are consistent with one another, and were further corroborated at the evidentiary hearing by Detective Branco's testimony. The Court finds Detective Branco testified credibly that he looked Barragan up in the Napa County Sheriff's Department databases, including CJNet, prior to arresting Barragan on December 6, 2018. Detective Branco was familiar with and could recognize Barragan based on several prior encounters, including a traffic stop in April 2017 and the execution of a search warrant on the Harding Avenue residence in August 2017. Branco Decl. ¶¶ 3-4. At some point after Detective Branco transferred to the NSIB in October 2018, he had reason to look Barragan up in CJNet because another detective told him that Barragan was suspected of being involved with drug sales with an individual whom Detective Branco had recently arrested. *Id.* ¶¶ 5-6. At this point, Detective Branco learned from CJNet that Barragan had an outstanding arrest warrant and that he was on probation with search conditions. *Id.* ¶ 6. Detective Branco also testified that he confirmed after the arrest that Barragan's arrest warrant was in fact still outstanding, and Barragan does not contest that it was.

Based on this evidence, the Court concludes that Detective Branco knew of Barragan's outstanding arrest warrant and that he therefore had probable cause to arrest Barragan on December 6, 2018. *See Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("Those are lawfully arrested whom

the facts known to the arresting officers give probable cause to arrest."). The search of Barragan's person was therefore a permissible search incident to a lawful custodial arrest. *See United States v. Camou*, 773 F.3d 932, 937 (9th Cir. 2014) (explaining that an "officer making a lawful arrest [may] conduct a search of the area within the arrestee's 'immediate control,' that is, 'the area from within which an arrestee might gain possession of a weapon or destructible evidence'") (citation and internal brackets omitted). In making this finding, the Court need not and does not reach Barragan's alternative argument that the officers lacked reasonable suspicion to search Barragan's person pursuant to his probation search conditions. *See* Reply at 8-10. And having found that the search of Barragan's person was a search incident to a lawful arrest, the Court likewise denies Barragan's request to suppress the evidence obtained from the Wilkens Avenue residence and from the search of his cell phone as the fruit of the poisonous tree.

## II. The Information on Which the Officers Acted Was Not Stale at the Time of Arrest.

Barragan additionally argues that even if the officers knew at some point that he had an outstanding arrest warrant, that information had grown stale by the time of his arrest on December 6, 2018. Reply at 4-6. Barragan argues it was unreasonable for an officer to rely on an arrest warrant issued several months earlier for failure to attend two probation meetings, a violation Barragan says could easily have been addressed and caused the warrant to be revoked. Barragan cites to Justice Powell's concurring opinion in *United States v. Watson*, 423 U.S. 411, 432 (1976). *See id*. In that case, the Supreme Court upheld the arrest of a defendant where the arrest was made with probable cause, even though the arresting officers had time to procure an arrest warrant and did not do so. The Supreme Court thus reversed the Ninth Circuit's determination that a felony arrest requires either a warrant or exigent circumstances. In concurring, Justice Powell explained that allowing the Ninth Circuit's rule to stand "could severely hamper effective law enforcement[,]" who might need to conduct further investigation after obtaining a warrant but before making the arrest, thereby "risk[ing] a court decision that the warrant had grown stale by the time it was used." *Watson*, 423 U.S. at 431-32. The Supreme Court did not, as Barragan frames it, endorse a rule regarding staleness of warrants.

Although the Ninth Circuit has not addressed the issue of staleness under facts similar to those at hand here, two other circuits have affirmed denials of motions to suppress despite the passage of time between the arresting officer confirming the existence of the warrant and the arrest taking place.

In *United States v. Hewlett* eleven months elapsed between an officer verifying an arrest warrant for murder and the defendant's arrest. 395 F.3d 458, 459 (D.C. Cir. 2005). The defendant moved to suppress a gun and ammunition that officers discovered during the search incident to his arrest. *Id*. The D.C. Circuit first noted that the defendant "cites no case (and we have found none) in which a court has concluded that an arrest lacked probable cause despite the existence of a valid warrant." *Id*. at 461. It then reasoned that the nature of the charge—murder—made it unlikely that the warrant had been quashed, withdrawn, or executed in the eleven months that passed since the agent first learned of it. *Id*. at 462. Thus, it was "reasonable for the arresting officers to believe that the warrant, and the finding of probable cause that it evidenced, remained valid" eleven months later. *Id*.

More recently, in an unpublished decision, the Tenth Circuit decided *United States v. Thomas*, in which one week elapsed between when an officer confirmed the existence of an arrest warrant on a misdemeanor charge and when the warrant was executed. 730 Fed. App'x 700, 701 (10th Cir. 2018). The defendant was in possession of a gun when he was arrested. *Id*. The Tenth Circuit held that while the officer could have been more diligent in checking the warrant's status, it was not unreasonable for the officer to believe that the warrant was still active. *Id*. at 703. First, only one week had passed since the officer checked the warrant. *Id*. Second, the officer promptly checked the warrant's status after the arrest to confirm it. *Id*.

Under the facts of this case, the Court disagrees with Barragan that it was unreasonable for Detective Branco to rely on his knowledge of a no-bail arrest warrant issued on October 1 when making an arrest on December 6. Even assuming that Detective Branco learned of the existence of the outstanding warrant on October 1, 2018, at the earliest,[4] just over two months would have passed

---

[4] At the evidentiary hearing, the government sought to introduce Exhibit 1 into evidence. Exhibit 1 purports to be a log showing which users in CJNet viewed Barragan's arrest warrant and

between his confirmation of and execution of the warrant. Detective Branco testified at the evidentiary hearing that he believed the warrant to still be active when making the arrest on December 6, and that he did not call dispatch to confirm that the warrant was still valid during the roughly one hour and forty minutes that he was surveilling Barragan for a variety of reasons: this was a "spontaneous operation," the operation was moving quickly and they had to follow Barragan as he was walking, and that Detective Branco had recently seen Barragan's outstanding arrest warrant in CJNet. Detective Branco also testified that he knew Barragan had not been booked into the county jail because Detective Branco checks the CJNet "in-custody report" daily, to learn who is being arrested and who is being released, and he had not seen Barragan show up on this report in relation to the arrest warrant. Although Detective Branco conceded that it is "possible" for an individual to clear a no-bail arrest warrant without being taken into custody, in Detective Branco's experience,[5] he had not known this to happen. For all these reasons, he believed the warrant for Barragan's arrest that he viewed at some point after October 1, 2018, was still outstanding at the time of the arrest on December 6, 2018. The Court finds that Detective Branco's conclusion was reasonable and rejects Barragan's argument regarding staleness under the facts presented here.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendant's motion to suppress.

**IT IS SO ORDERED**.

Dated: October 17, 2019

_____
SUSAN ILLSTON
United States District Judge

---

when. The government presented no witness who created the log or who could testify to its accuracy. For the reasons stated on the record at the hearing, the Court SUSTAINS Barragan's objection to admission of this exhibit.

[5] Detective Branco testified that he joined the Napa County Sheriff's Department as a deputy sheriff in January 2017 and that he became a detective in NSIB in October 2018.

11